## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| DIGI SOLUTIONS, INC. 17224 McCORMICK ROAD, SUITE 405 HUNT VALLEY, MD 21031 | * * |
| *Plaintiff* | * |
| v. | * |
| PROXY MARKETING, LLC d/b/a PROXY MARKETING & TECH 425 Abigail Avenue Waynesboro, PA 21161 | * * |
| Serve on: James Thomas 425 Abigail Avenue Waynesboro, PA 17268 | * * |
| & | * |
| ALEXANDRA MARMION 19329 Burke Road White Hall, MD 21161 | * * |
| & | * |
| JAMES THOMAS 425 Abigail Avenue Waynesboro, PA 17268 | * * |
| & | * |
| MICHAEL WILLIAMS 3203 Suffolk Lane Fallston, MD 21047 | * * |
| *Defendants* | * |

Case No.:

**DEMAND FOR JURY TRIAL**

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Per 18 U.S.C. §§ 1836, Plaintiff Digi Solutions, Inc. hereby submits the following Verified Complaint (the "Complaint"), which is being filed concurrently with its *Emergency* Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum of Law in support of that motion, and respectfully states as follows:

## I.    PARTIES

1.      Plaintiff Digi Solutions, Inc. ("DSI") is a Maryland Corporation with a registered principal office located at 11350 McCormick Road, Suite 405, Hunt Valley, MD 21031. DSI is a digital marketing agency that provides search engine optimization (SEO), AI engine optimization, website design, and Google Ads services to clients throughout the United States.

2.      Alexandria Marmion is an individual living in Baltimore County, MD, at 19329 Burke Road, White Hall, MD 21161.

3.      James Thomas is an individual living in Franklin County, PA, at 25 Abigail Avenue, Waynesboro, PA 17268.

4.      Michael Williams is an individual living in Harford County, MD, at 3203 Suffolk Lane, Fallston, MD 21047.

5.      Proxy Marketing, LLC d/b/a Proxy Marketing & Tech ("Proxy") is a Pennsylvania LLC registered on April 22, 2026. Proxy provides SEO, AI engine optimization, website design, and Google Ads services.

## II.    VENUE & JURISDICTION

6.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 because DSI asserts claims arising under federal law, including the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, et seq., and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

7.      This Court has supplemental jurisdiction over DSI's claims arising under state law pursuant to 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as Plaintiff's federal claims and form part of the same case or controversy under Article III of the United States Constitution.

2

8.      This Court has personal jurisdiction over Defendants because they reside in, conduct business in, and/or committed the acts alleged in the State of Maryland.

9.      Venue is proper in this Court per 28 U.S.C. § 1391 (b) and (c). Defendants Proxy and Thomas conduct business in the State of Maryland and Defendants Marmion and Williams reside and carry on business in the State of Maryland. Additionally, the acts alleged occurred within the State of Maryland.

### III.    FACTS

10.     As reflected in its 4.3-star Google rating, DSI has developed a strong reputation by building websites, managing paid search campaigns, and tailoring digital content to improve visibility and effectiveness within AI-driven platforms and large language models. DSI is a marketing agency focused on SEO, AI engine optimization, website design, and Google Ads.

11.     DSI operates in a highly competitive industry.

12.     In the course of its business, DSI maintains proprietary information including among other things, client lists, client contact information, client account credentials, website repositories and developmental infrastructure, internal workflows, fulfillment processes, campaign configurations, and account management information.

**A.      Individual Defendants Sign NDAs.**

13.     Ms. Marmion, Mr. Thomas, and Mr. Williams (collectively, "Individual Defendants") are former employees of DSI.

14.     On April 9, 2025, Ms. Marmion and Mr. Williams each executed Non-Disclosure, Non-Compete, and Non-Solicitation Agreements with DSI. True and accurate copies of Ms. Marmion's and Mr. Williams's agreements are attached hereto as Exhibit 1 and Exhibit 2, respectively.

15. On April 14, 2025, Mr. Thomas signed a Non-Disclosure, Non-Compete, and Non-Solicitation Agreement with DSI. A true and accurate copy of Mr. Thomas's agreement is attached hereto as Exhibit 3. Collectively, the agreements referenced in Paragraphs 17 and 18 are referred to herein as the "NDAs."

16. Section 1(a) of the NDAs provides that "At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary or Financial Information." Exs. 1-3, § 1(a).

17. Section 1(b) defines Proprietary or Financial Information to include, among other things, "trade secrets, inventions, intellectual property, mask words, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, [and] designs and techniques." *Id.*, § 1(b).

18. Section 2 of the NDAs states, "I agree that during the period of my employment by the Company I will not, without the Company's express written consent, directly or indirectly engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my employment by the Company." *Id.*, § 2.

19. Section 3 of the NDAs further provides that the employee shall, upon request or upon termination of employment, return all documents, records, or other materials in his or her possession or control relating to the employee's services to DSI. *See id.*, § 3.

20. Section 4 of the NDAs provides that the employee agrees that, during employment and for a period of twelve (12) months following separation, he or she will not directly or indirectly engage in, assist, or have any financial interest in any business that competes with DSI's business activities. *See id.*, § 4.

4

21.     Section 5 of the NDAs further provides that, during employment and for one (1) year following separation, the employee will not solicit, induce, or attempt to induce any customer or prospective customer with whom DSI had direct or indirect contact. *See id.*, § 5.

**B.     Individual Defendants Prepare to Compete.**

22.     On or around March 2, 2026, Mr. Thomas, while still employed by DSI, downloaded approximately sixty-three DSI client records from HubSpot using an account associated with his DSI email address, james@digi-solutions.com. A true and accurate copy of Mr. Thomas's download history is attached hereto as Exhibit 4.

23.     On or around March 19, 2026, while still employed by DSI, Ms. Marmion downloaded approximately sixty-eight DSI client records from HubSpot using an account associated with her DSI email address, lexi@digi-solutions.com. A true and accurate copy of Ms. Marmion's download history is attached hereto as Exhibit 5.

24.     Upon information and belief, Mr. Thomas and Ms. Marmion continue to possess and/or have access to the client records they exported and downloaded from HubSpot.

25.     On or around March 28, 2026, the domain name proxymarketing.ai was registered. This domain name is used by Individual Defendants in connection with their competing business, Proxy. A true and accurate copy of the homepage for Proxy's website, proxymarketing.ai, is attached hereto as Exhibit 6.

26.     On or around March 29, 2026, a GitHub account with the username "JimmyFlame77" created a repository titled "proxy-marketing-landing."

27.     Between March and April 2026, the "JimmyFlame77" GitHub account created an additional repository titled "a-better-hauling." At the time, A Better Hauling Co was a DSI client.

28.    Activity associated with the foregoing repositories continued through May 2026, including up to and around the time Individual Defendants resigned from DSI. True and accurate copies of screenshots reflecting the "JimmyFlame77" GitHub account activity from March 2026 through May 2026 are attached hereto as Exhibit 7.

29.    Upon information and belief, the "JimmyFlame77" GitHub account is owned and/or controlled by Mr. Thomas. The profile associated with the account appears to include a photograph of Mr. Thomas. *See* Ex. 7.

30.    On April 23, 2026, DSI received an email notification indicating that mike@proxymarketing.ai had been added as an owner of the account for Drinx Market, a DSI client. A true and accurate copy of this email is attached as Exhibit 8.

31.    On May 11, 2026, DSI received an email notification indicating that the admin email address associated with Rapidmix Parts, a DSI client, had been changed to mike@proxymarketing.ai. A true and accurate copy of this email is attached as Exhibit 9.

32.    The NDAs provide that Individual Defendants were prohibited from engaging in "any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my employment by the Company." Exs. 1-3, § 2.

### C.    Individual Defendants Resign.

33.    On or around May 15, 2026, Individual Defendants, all of whom were then employed by DSI, resigned. A true and accurate copy of Ms. Marmion's resignation is attached hereto as Exhibit 10.

34.    Around the same time, Individual Defendants officially announced and/or began operating their competing business, Proxy. Upon information and belief, Individual Defendants were operating Proxy prior to their resignation from DSI.

35.    Section 4 of the NDAs prohibits Individual Defendants, for a period of one (1) year following termination of employment, from directly or indirectly engaging in, assisting, or having financial interest in any business that competes with DSI's business activities. *See* Exs. 1-3, § 4.

36.    In violation of the NDAs, Individual Defendants formed and are operating the competing company, Proxy. Proxy offers services including SEO, ads consultation, and predictive analytics, similar to those offered by DSI.

**D.    The Defendants Solicit DSI's Clients.**

37.    Upon information and belief, Individual Defendants have directly or indirectly solicited DSI clients on behalf of Proxy and have encouraged those clients to terminate their relationships with DSI.

38.    On May 14, 2026, one day before Individual Defendants resigned, Taylor Containers terminated its services with DSI. A true and accurate copy of the email notifying DSI of Taylor Containers' cancellation of services is attached hereto as Exhibit 11.

39.    On May 15, 2026, Baltimore T-Shirt Company and Dandy Ridged Dumpsters terminated its services with DSI. True and accurate copies of the emails notifying DSI of Baltimore T-Shirt Company and Dandy Ridged Dumpsters' cancellation of services are attached hereto as Exhibit 12.

40.    On May 18, 2026, Down to Earth Landscaping and M&L Hauling and Removal terminated its services with DSI. True and accurate copies of the emails notifying DSI of Down to Earth Landscaping and M&L Hauling and Removal's cancellation of services are attached hereto as Exhibit 13.

41.    Since May 2026, at least forty-one (41) clients have terminated their relationships with DSI. Several of those clients had maintained long-standing relationships with DSI, including

M&L Hauling and Removal, which had been a DSI client for approximately four years. A true and accurate copy of DSI's cancellation list is attached hereto as Exhibit 14.

42.     On May 18, 2026, DSI received an email notifying it that the admin email address for Dumpster Daddy Augusta, a client of DSI at the time of Individual Defendants' resignation, had changed to support@proxymarketing.ai. A true and accurate copy of this email is attached as Exhibit 15.

43.     On May 18, 2026, DSI received an email notifying is that the admin email address for Joy Strouse | Novelist, a client of DSI at the time of Individual Defendants' resignation, had changed to support@proxymarketing.ai. A true and accurate copy of this email is attached as Exhibit 16.

44.     On May 19, 2026, DSI received an email notifying is that the admin email address for somerslumber.com, a client of DSI at the time of Individual Defendants' resignation, was notified that a user with the username mike@proxymarketing.ai had signed into the WordPress site. A true and accurate copy of this email is attached as Exhibit 17. It was also notified that mike@proxymarketing.ai was added as an owner. *See id.*

45.     Upon information and belief, the mike@proxymarketing.ai email belongs to or is controlled by Mr. Williams.

46.     Upon information and belief, the support@proxymarketing.ai email belongs to or is controlled by Individual Defendants.

47.     Section 5 of the NDAs further provides that, during employment and for one (1) year following separation, the employee will not solicit, induce, or attempt to induce any customer or prospective customer with whom DSI had direct or indirect contact. *See* Exs. 1-3, § 5.

8

48.    Despite this, in violation of their NDAs, Individual Defendants caused numerous DSI clients to terminate their relationships with DSI and transfer their business to their competing company, Proxy.

**E.    Defendants Retain Access to DSI's Proprietary Information.**

49.    On May 19, 2026, DSI discovered that the email account mike@proxymarketing.ai had access to their Google Search Console. A true and accurate copy of a screenshot of the users and permissions of DSI's Google Search Console is attached as Exhibit 18.

50.    Upon information and belief, the mike@proxymarketing.ai email belongs to or is controlled by Mr. Williams.

51.    Individual Defendants have also restricted DSI's full administrative access to DSI-owned, DSI-managed, or client-related digital platforms, including, but not limited to, Google Ads accounts, Google Analytics, Google Tag Manager, Google Business Profiles, Meta Business Manager Accounts, websites and domains, hosting accounts, CRM systems, social media accounts, email accounts, call tracking systems, third-party software platforms and vendor systems. For example, DSI currently lacks access to LinkedIn Ads for its client account Classic Cleanout – Ron Diemer, as Mr. Thomas retains access to that account.

52.    Upon information and belief, Defendants have access to and are using Proprietary and Financial Information including, but not limited to, client lists, client contact information, client account credentials, website repositories and developmental infrastructure, internal workflows, fulfillment processes, campaign configurations, and account management information, including data exported and downloaded from HubSpot by Ms. Marmion and Mr. Thomas.

53.    Upon information and belief, Individual Defendants have also have retained physical and digital property belonging to DSI, including, but not limited to, laptops and

computers, monitors, headsets and headphones, phones and communication devices, storage devices and external drives, documents and operational manuals, client records and client databases, passwords, passcodes, and authentication credentials, and proprietary files, reports, and data.

54.     Section 3 of the NDAs provides that the employee shall, upon request or upon termination of employment, return all documents, records, or other materials in his or her possession or control relating to the employee's services to DSI. *See* Exs. 1-3, § 3.

55.     Despite this, and in violation of the NDAs, Defendants have retained documents, records, and other materials relating to their services for DSI and have used such materials in connection with the operation of a competing business.

### E.     Defendants Refuse to Cease and Desist.

56.     In an effort to address DSI's concerns, on May 25, 2026, DSI, through counsel, sent a cease-and-desist letter to Proxy demanding that Defendants immediately cease and desist from all direct or indirect solicitation, communication, diversion, interference, or business dealings with any current, former, or prospective clients, leads, vendors, or other business relationships associated with DSI, and further demanding that Defendants cease violating the non-compete provisions of the NDAs. A true and accurate copy of DSI's May 25, 2026, letter is attached hereto as Exhibit 19.

57.     On May 27, 2026, counsel for Defendants responded, denying that Defendants were in violation of the NDAs and asserting, among other things, that they had not had an adequate opportunity to review the agreements prior to execution. Defendants further denied the allegations of solicitation, retention of DSI property, and related misconduct. A true and accurate copy of Defendants' May 27, 2026, response letter is attached hereto as Exhibit 20.

58. Absent temporary, preliminary, and permanent injunctive relief, Defendants will continue to wrongfully compete with DSI and to misappropriate, use, and disclose DSI's confidential information and trade secrets, causing DSI irreparable harm.

## COUNT I – BREACH OF CONTRACT (Individual Defendants)

59. DSI incorporates all preceding paragraphs as if fully stated herein.

60. Individual Defendants and DSI entered into the NDAs in April 2025.

61. In the NDAs, Individual Defendants agreed that, for a period of one (1) year following termination of employment, they would not directly or indirectly engage in, assist, or have any financial interest in any business that competes with DSI. *See* Exs. 1-3, § 4.

62. On or around May 15, 2026, Individual Defendants terminated their employment with DSI. *See* Ex. 10.

63. The obligations set forth under the NDAs survived termination of employment. *See* Exs. 1-3, § 9 ("The provisions of this Agreement shall survive the termination of Employee's employment, regardless of the reason…").

64. In breach of the NDAs, Individual Defendants created, operated, and continue to operate a competing business, Proxy. Upon information and belief, Individual Defendants began competing with DSI on or before the formation of Proxy in May 2026.

65. As a result of Individual Defendants breach of the NDAs, DSI has suffered damages.

## COUNT 2 – BREACH OF CONTRACT (Individual Defendants)

66. DSI incorporates all preceding paragraphs as if fully stated herein.

67. Individual Defendants and DSI entered into the NDAs in April 2025.

68.    In the NDAs, Individual Defendants agreed that, during employment and for one (1) year following separation, they would not solicit, induce, or attempt to induce any customer or prospective customer with whom DSI had direct or indirect contact. *See id., § 5.*

69.    On or around May 15, 2026, Individual Defendants terminated their employment with DSI. *See* <u>Ex. 10</u>.

70.    The obligations set forth under the NDAs survived termination of employment. *See* <u>Exs. 1-3</u>, § 9 ("The provisions of this Agreement shall survive the termination of Employee's employment, regardless of the reason…").

71.    Upon information and belief, Individual Defendants have directly or indirectly solicited DSI clients on behalf of Proxy and have encouraged those clients to terminate their relationships with DSI in breach of the NDAs.

72.    Since May 2026, at least forty-one (41) clients have terminated their relationships with DSI. Several of those clients had maintained long-standing relationships with DSI. *See* <u>Ex. 14</u>. At least five (5) clients terminated their services with DSI within five (5) days of Individual Defendants' resignations from DSI on or around May 15, 2026. *See* <u>Exs. 11-13</u>.

73.    Less than one week after Individual Defendants resigned on or around May 15, 2026, DSI received email notifications informing it that an email address mike@proxymarketing.ai and support@proxymarketing.ai had been added as an owner or administrative of or been added to several client sites DSI had worked on, who upon Individual Defendants' departure terminated their services with DSI. *See* <u>Exs. 15-17</u>.

74.    Upon information and belief, the mike@proxymarketing.ai email belongs to or is controlled by Mr. Williams.

75.    As a result of Individual Defendants breach of the NDAs, DSI has suffered damages.

### COUNT 3 – BREACH OF CONTRACT (Individual Defendants)

76.    DSI incorporates all preceding paragraphs as if fully stated herein.

77.    Individual Defendants and DSI entered into the NDAs in April 2025.

78.    Section 3 of the NDAs provides that the employee shall, upon request or upon termination of employment, return all documents, records, or other materials in his or her possession or control relating to the employee's services to DSI. *See id.*, § 3.

79.    On or around May 15, 2026, Individual Defendants terminated their employment with DSI. *See* Ex. 10.

80.    The obligations set forth under the NDAs survived termination of employment. *See* Exs. 1-3, § 9 ("The provisions of this Agreement shall survive the termination of Employee's employment, regardless of the reason…").

81.    Upon information and belief, Individual Defendants have access to and are using Proprietary and Financial Information including, but not limited to, client lists, client contact information, client account credentials, website repositories and infrastructure, internal workflows, fulfillment processes, campaign configurations, and account management information, including data exported and downloaded from HubSpot by Ms. Marmion and Mr. Thomas.

82.    Upon information and belief, Individual Defendants have also have retained physical and digital property belonging to DSI, including, but not limited to, laptops and computers, monitors, headsets and headphones, phones and communication devices, storage devices and external drives, documents, client records and client databases, passwords, passcodes, and authentication credentials, and proprietary files, reports, and data.

13

83.     Despite DSI's request for return and their termination of employment, Individual Defendants have retained documents, records, and other materials relating to their services for DSI and have used such materials in connection with the operation of a competing business in breach of the NDAs.

84.     As a result of Individual Defendants breach of the NDAs, DSI has suffered damages.

### COUNT 4 – BREACH OF CONTRACT (Individual Defendants)

85.     DSI incorporates all preceding paragraphs as if fully stated herein.

86.     Individual Defendants and DSI entered into the NDAs in April 2025.

87.     The NDAs provide that Individual Defendants were prohibited from engaging in "any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my employment by the Company." *See* Exs. 1-3, § 2.

88.     On or around March 2, 2026, Mr. Thomas, while still employed by DSI, downloaded approximately sixty-three DSI client records from HubSpot using an account associated with his DSI email address, james@digi-solutions.com. *See* Ex. 4.

89.     On or around March 19, 2026, while still employed by DSI, Ms. Marmion downloaded approximately sixty-eight DSI client records from HubSpot using an account associated with her DSI email address, lexi@digi-solutions.com. *See* Ex. 5.

90.     On or around March 28, 2026, the domain name proxymarketing.ai was registered. This domain name is used by Individual Defendants in connection with their competing business, Proxy. *See* Ex. 6.

91.     On or around March 29, 2026, a GitHub account with the username "JimmyFlame77" created a repository titled "proxy-marketing-landing." *See* Ex. 7.

14

92.    Between March and April 2026, the "JimmyFlame77" GitHub account created an additional repository titled "a-better-hauling." At the time, A Better Hauling Co was a DSI client.

93.    Activity associated with the foregoing repositories continued through May 2026, including up to and around the time Individual Defendants resigned from DSI. *Id.*

94.    Upon information and belief, the "JimmyFlame77" GitHub account is owned and/or controlled by Mr. Thomas. The profile associated with the account appears to include a photograph of Mr. Thomas. *Id.*

95.    On April 23, 2026, DSI received an email notification indicating that mike@proxymarketing.ai had been added as an owner of the account for Drinx Market, a DSI client. *See* Ex. 8.

96.    On May 11, 2026, DSI received an email notification indicating that the admin email address associated with Rapidmix Parts, a DSI client, had been changed to mike@proxymarketing.ai. *See* Ex. 9.

97.    On or around May 15, 2026, Individual Defendants terminated their employment with DSI. *See* Ex. 10.

98.    While employed by DSI, Individual Defendants did not receive DSI's express written consent to engage in any employment or business activity which is directly or indirectly competition with, or would otherwise conflict with, their employment at DSI.

99.    Nonetheless, while still employed by DSI, Individual Defendants took steps to compete with DSI by preparing to launch a competing company, Proxy, in breach of the NDAs.

100.    As a result of Individual Defendants breach of the NDAs, DSI has suffered damages.

**COUNT 5 – BREACH OF CONTRACT (Individual Defendants)**

15

101.   DSI incorporates all preceding paragraphs as if fully stated herein.

102.   Individual Defendants and DSI entered into the NDAs in April 2025.

103.   Section 1(a) of the NDAs provides that "At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary or Financial Information." Exs. 1-3, § 1(a).

104.   Section 1(b) defines Proprietary or Financial Information to include, among other things, "trade secrets, inventions, intellectual property, mask words, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, [and] designs and techniques." *Id.*, § 1(b).

105.   The obligations set forth under the NDAs survived termination of employment. *See* Exs. 1-3, § 9 ("The provisions of this Agreement shall survive the termination of Employee's employment, regardless of the reason…").

106.   On or around March 2, 2026, Mr. Thomas, while still employed by DSI, downloaded approximately sixty-three DSI client records from HubSpot using an account associated with his DSI email address, james@digi-solutions.com. *See* Ex. 4.

107.   On or around March 19, 2026, while still employed by DSI, Ms. Marmion downloaded approximately sixty-eight DSI client records from HubSpot using an account associated with her DSI email address, lexi@digi-solutions.com. *See* Ex. 5.

108.   Upon information and belief, Mr. Thomas and Ms. Marmion continue to possess and/or have access to the client records they exported and downloaded from HubSpot.

109.   On May 19, 2026, DSI discovered that the email account mike@proxymarketing.ai had access to their Google Search Console. *See* Ex. 18.

110.    Upon information and belief, the mike@proxymarketing.ai email belongs to or is controlled by Mr. Williams.

111.    Individual Defendants have restricted DSI's full administrative access to DSI-owned, DSI-managed, or client-related digital platforms, including, but not limited to, Google Ads accounts, Google Analytics, Google Tag Manager, Google Business Profiles, Meta Business Manager Accounts, websites and domains, hosting accounts, CRM systems, social media accounts, email accounts, call tracking systems, third-party software platforms and vendor systems. For example, DSI currently lacks access to LinkedIn Ads for its client account Classic Cleanout – Ron Diemer, as Mr. Thomas retains access to that account.

112.    Upon information and belief, Individual Defendants have access to and are using Proprietary and Financial Information including, but not limited to, client lists, client contact information, client account credentials, website repositories and developmental infrastructure, internal workflows, fulfillment processes, campaign configurations, and account management information, including data exported and downloaded from HubSpot by Ms. Marmion and Mr. Thomas, in the operation of their competing business, Proxy. This is a breach of their NDAs.

113.    As a result of Individual Defendants breach of the NDAs, DSI has suffered damages.

## COUNT 6 – MISAPPROPRIATION OF TRADE SECRETS UNDER DEFENSE TRADE SECRETS ACT (All Defendants)

114.    DSI incorporates all preceding paragraphs as if fully stated herein.

115.    In the course of its business, DSI maintains proprietary information including among other things, client lists, client contact information, client account credentials, website repositories and developmental infrastructure, internal workflows, fulfillment processes, campaign

17

configurations, and account management information. DSI has invested substantial time, effort, and resources over many years to develop, compile, and maintain this information.

116.    Because of the value of this information, DSI takes reasonable measures to maintain their secrecy and confidentiality, including requiring employees to execute agreements containing non-disclosure provisions that prohibit the use, disclosure, or retention of such information following the termination of employment. DSI restricts access of this information to employees and requires the use of DSI-issued email accounts to access its databases.

117.    DSI operates in a highly competitive industry in which the protection of trade secrets is essential to maintaining its competitive advantage.

118.    Nevertheless, Individual Defendants improperly exported and downloaded DSI client records from HubSpot, including records accessed by Ms. Marmion and Mr. Thomas, for use in the operation of their competing business, Proxy

119.    Individual Defendants also improperly granted themselves and Proxy access to DSI's Google Search Console and restricted DSI's full administrative access to DSI-owned, DSI-managed, and client-related digital platforms. *See* Ex. 18.

120.    Defendants knew or should have known that DSI's client records and other trade secrets were acquired and continued to be retained through improper means.

121.    Despite that knowledge, Defendants used DSI's trade secrets to solicit and perform services for DSI's clients, including within DSI's core service areas in Maryland.

122.    Individual Defendants' acquisition, retention, and use of DSI's trade secrets demonstrate that they knew or should have known that such information had been obtained through improper means and not through accident, mistake, or any authorized business purpose.

123. By no later than May 25, 2026, any claim of accident or mistake was foreclosed when DSI sent Defendants a cease-and-desist letter expressly notifying them that their acquisition, retention, and use of DSI's trade secrets was unauthorized and improper.

124. Upon information and belief, Defendants continue to use DSI's trade secrets and confidential information in connection with their solicitation of DSI's clients.

125. As a result, DSI has suffered damages.

126. Proxy is owned, operated, and controlled by Individual Defendants and is therefore vicariously liable for the misappropriation of DSI's Trade Secrets committed within the scope of Individual Defendants' operation and management of Proxy.

## COUNT 7 – UNFAIR COMPETITION
## UNDER MARYLAND LAW (Proxy)

127. DSI incorporates all preceding paragraphs as if fully stated herein.

128. Proxy acquired, retained, and used DSI's trade secrets and confidential information that had been improperly obtained from DSI by its former employees.

129. Proxy used DSI's trade secrets and confidential information to solicit DSI's clients and perform services for those clients within the heart of DSI's services areas in Maryland.

130. DSI and Proxy operate in a highly competitive industry, and Proxy's acquisition, retention, and use of DSI's trade secrets and confidential information that it has developed and maintained through years of investment, effort, and goodwill provides Proxy with an unfair competitive advantage.

131. Through its wrongful conduct, Proxy has unfairly competed with DSI and has jeopardized DSI's customer relationships, business opportunities, and goodwill through improper, deceptive, and unfair business practices.

19

132.    As a direct and proximate result of Proxy's conduct, DSI has suffered and continues to suffer damages, including the loss of clients, revenue, and goodwill.

## COUNT 8 – COMPUTER FRAUD AND ABUSE ACT ("CFAA") (Ms. Marmion, Mr. Thomas, and Proxy)

133.    DSI incorporates all preceding paragraphs as if fully stated herein.

134.    While employed by DSI, Ms. Marmion and Mr. Thomas were granted limited authorization to access DSI's protected computer systems solely for legitimate business purposes related to their employment.

135.    Ms. Marmion and Mr. Thomas exceeded their authorized access by exporting and downloading copies of DSI's trade secrets and confidential information from HubSpot and retaining such information after the termination of their employment and without DSI's authorization. *See* Exs. 4-5.

136.    DSI's protected computer systems store and maintain information used by DSI and its employees in the provision of services to clients and in the operation of DSI's business.

137.    As a direct and proximate result of Defendants' unauthorized access to, acquisition of, retention of, and use of information obtained from DSI's protected computer systems, DSI has suffered and continues to suffer damages.

138.    Proxy is owned, operated, and controlled by Individual Defendants, including Ms. Marmion and Mr. Thomas, and is therefore vicariously liable for the misappropriation of DSI's Trade Secrets committed within the scope of the Ms. Marmion and Mr. Thomas's operation and management of Proxy.

## COUNT 9 – TORTIOUS INTERFERENCE (Individual Defendants)

139.    DSI incorporates all preceding paragraphs as if fully stated herein.

20

140.    DSI maintained relationships with numerous clients for the provision of SEO, AI engine optimization, website design, Google Ads management, and related marketing services.

141.    Through their employment with DSI, Individual Defendants had knowledge of DSI's relationships with its clients

142.    Upon information and belief, Individual Defendants have intentionally and willfully solicited DSI clients on behalf of Proxy and have encouraged those clients to terminate their relationships with DSI to cause damage to DSI in its lawful business.

143.    On May 14, 2026, one day before Individual Defendants resigned, Taylor Containers terminated its services with DSI. *See* Ex. 11.

144.    On May 15, 2026, Baltimore T-Shirt Company and Dandy Ridged Dumpsters terminated its services with DSI. *See* Ex. 12.

145.    On May 18, 2026, Down to Earth Landscaping and M&L Hauling and Removal terminated its services with DSI. *See* Ex. 13.

146.    Since May 2026, at least forty-one (41) clients have terminated their relationships with DSI. Several of those clients had maintained long-standing relationships with DSI, including M&L Hauling and Removal, which had been a DSI client for four years. *See* Ex. 14.

147.    On May 18, 2026, DSI received an email notifying it that the admin email address for Dumpster Daddy Augusta, a client of DSI at the time of Individual Defendants' resignation, had changed to support@proxymarketing.ai. *See* Ex. 15.

148.    On May 18, 2026, DSI received an email notifying is that the admin email address for Joy Strouse | Novelist, a client of DSI at the time of Individual Defendants' resignation, had changed to support@proxymarketing.ai. *See* Ex. 16.

149.    On May 19, 2026, DSI received an email notifying is that the admin email address for somerslumber.com, a client of DSI at the time of Individual Defendants' resignation, was notified that a user with the username mike@proxymarketing.ai had signed into the WordPress site. *See* Ex. 17. It was also notified that mike@proxymarketing.ai was added as an owner. *See id.*

150.    Upon information and belief, the mike@proxymarketing.ai email belongs to or is controlled by Mr. Williams.

151.    Upon information and belief, the support@proxymarketing.ai email belongs to or is controlled by Individual Defendants.

152.    The transfer of client account control and diversion of clients to a competing business constitutes conduct that is independently wrongful apart from its effect on DSI's business relationships. Likewise, it was done with the unlawful purpose of causing damage and loss to DSI's business relationships, constituting malice.

153.    As a result of Individual Defendants' conduct, DSI has suffered damages, including the loss of numerous clients and the revenue associated with those relationships.

## COUNT 10 – PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF (All Defendants)

154.    DSI incorporates all preceding paragraphs as if fully stated herein.

155.    The NDAs state: "In the event of any breach or threatened breach by Employee of any of the provisions of this Agreement, Employee agrees... that Employer... shall be entitled to equitable relief, including, but not limited to, temporary, preliminary, and permanent injunctions." Exs. 1-3, § 6.

156.    DSI seeks and is entitled to preliminary and permanent injunctive relief restricting Defendants from: (1) acquiring, retaining, and using DSI's trade secrets and confidential information; (2) soliciting DSI's clients that Individual Defendants serviced or became known to

22

them during their employment with DSI; and (3) retaining any DSI-owned equipment or tools which remain in their possession.

157.    DSI has suffered, and absent injunctive relief will continue to suffer, immediate and irreparable harm as a result of Defendants' ongoing use and retention of DSI's trade secrets and confidential information and their continued violations of their NDAs.

158.    DSI lacks an adequate remedy at law because the loss of clients, goodwill, trade secrets and confidential information, and its competitive advantage cannot be fully compensated through monetary damages alone.

159.    The requested relief is in the public interest.

**COUNT I1 – DECLARATORY JUDGMENT (All Defendants)**

160.    DSI incorporates all preceding paragraphs as if fully stated herein.

161.    The NDAs state: "In the event of any breach or threatened breach by Employee of any of the provisions of this Agreement, Employee agrees… that Employer… shall be entitled to equitable relief, including, but not limited to, temporary, preliminary, and permanent injunctions." Exs. 1-3, § 6.

162.    The NDAs further state: "In the event of any breach or threatened breach by Employee of any of the provisions of this Agreement, Employee agrees that monetary damages will be inadequate, that the Company will be irreparably damaged…" *Id.*

163.    An actual controversy exists between the parties because Defendants deny that DSI is entitled to temporary, preliminary, or permanent injunctive relief under the NDAs.

164.    Individual Defendants have, at a minimum, engaged in conduct constituting a threatened breach of the NDAs.

165.    Per the express terms of the NDAs, Defendants agreed that, in the event of a breach or threatened breach, monetary damages would be inadequate, DSI would suffer irreparable harm, and DSI would be entitled to equitable relief, including temporary, preliminary, and permanent injunctions.

166.    A declaration that, in the event of a breach or threatened breach of the NDAs by any Defendant, (1) monetary damages are inadequate to remedy such breach, (2) DSI will suffer irreparable harm, and (3) DSI is entitled to seek and obtain equitable relief, including temporary, preliminary, and permanent injunctive relief will simplify this case.

WHEREFORE, Plaintiff Digi Solutions, Inc. respectfully requests that this Court enter judgment in favor of DSI and against Defendants as follows:

- A declaratory judgment that, in the event of a breach or threatened breach of the NDAs by any Defendant, (1) monetary damages are inadequate to remedy such breach, (2) DSI will suffer irreparable harm, and (3) DSI is entitled to seek and obtain equitable relief, including temporary, preliminary, and permanent injunctive relief;

- A Temporary Restraining Order and Preliminary and Permanent Injunctive Relief restricting Defendants from (1) acquiring, retaining, and using DSI's trade secrets and confidential information; (2) soliciting DSI's clients that Individual Defendants serviced or became known to them during their employment with DSI; and (3) retaining any DSI-owned equipment or tools which remain in their possession; and

- Actual damages that DSI is entitled to recover as a result of Defendants' wrongful conduct

  - Incidental and consequential damages as permitted by law;
  - Disgorgement and restitution for all profits of Proxy since May 15, 2026;
  - DSI's reasonable attorney's fees and costs;
  - Treble damages as permitted by law;
  - Punitive damages;
  - Pre-and-post judgment interest as permitted by law; and

24

- any further relief this Court deems just.

## JURY DEMAND

Per Fed. R. Civ. P. 38, Plaintiff demands a jury for all issues able to be tried by jury.


Respectfully submitted,

_/s/ Jan I. Berlage_
Jan I. Berlage (23937)
Gohn Hankey & Berlage LLP
201 N. Charles Street, Suite 2101
Baltimore, Maryland 21201
410-752-9300
410-752-2519 (fax)
jberlage@ghsllp.com

*Counsel for Plaintiff*

25

## VERIFICATION

I, Charles Warren, authorized agent of Digi Solutions, Inc., solemnly affirm under penalties of perjury that the contents of the foregoing Verified Complaint and Jury Demand are true, based upon my personal knowledge.

Jul 23, 2026
_____
Date Executed

_____
Charles Warren
Authorized Agent of Digi Solutions, Inc.

26